IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

KEITH RHAMES,

                    Petitioner,          Civil Action. No.
                                          9:17-CV-0291 (LEK/DEP)

     v.

SUPERINTENDENT,

                    Respondent.

_____

APPEARANCES:                OF COUNSEL:

FOR PETITIONER:

KEITH RHAMES, *Pro Se*
90-T-3317
Mid State Correctional Facility
P.O. Box 3600
Marcy, NY 13240

FOR RESPONDENT:

HON. ERIC T. SCHNEIDERMAN     MATTHEW B. KELLER, ESQ.
New York State Attorney General     Assistant Attorney General
The Capitol
Albany, NY 12221

## REPORT AND RECOMMENDATION

      This is a proceeding commenced by *pro se* petitioner Keith Rhames,

a New York State prison inmate as a result of a 1990 conviction for murder

and weapon possession, seeking habeas relief pursuant to 28 U.S.C. §

2254. In his petition, Rhames challenges a decision issued by the New York State Parole Board denying him parole. For the reasons set forth below, I recommend that the petition be denied and dismissed in all respects.

I.    BACKGROUND

Following a jury trial conducted in 1990 in New York State Supreme Court, Kings County, petitioner was found guilty of second-degree murder and criminal possession of a weapon in the second- and third-degrees under New York State law. Dkt. No. 15-1 at 83. As was described in a report generated by the New York State Parole Board ("Parole Board"), the underlying facts of petitioner's crimes are as follows:

> On 3/12/89, at approximately 9:45 pm, the Subject and two unapprehended others, followed the victim into 162 Troy Ave. Bklyn, NY, and then proceeded to discharge two rounds into the victim's abdomen. One eyewitness observed the Subject follow the deceased into the building, heard two shots and then saw the Subject fleeeing [sic] the building. The second witness observed the Subject shooting his victim. Both witnesses identified the Subject in line-up.

*Id.* As a result of his conviction, petitioner was sentenced on October 17, 1990, to an aggregate prison term of twenty-five years to life. *Id.* at 52, 75.

On December 1, 2015, petitioner appeared before the Parole Board

for a second time.[1]  Dkt. No. 15-1 at 109-20. Although during that parole

hearing petitioner admitted his guilt to the crimes of conviction, he

disputed one of the Parole Board Commissioner's summary of the

underlying facts. *Id.* at 111. That disagreement is reflected in the following

colloquy between Commissioner J. Smith and petitioner at the parole

hearing:

> Q.    The instant offense dates back to March of
> 1989. You and two others followed the victim into a
> residence or an apartment in Brooklyn and
> discharged two rounds into his abdomen.
>
> A.    No, that's not what happened.
>
> Q.    What happened? Give me your version.
>
> A.    We didn't follow him. We went in the building.
> I never got to – we went to the elevator and as we
> got – as I got on the elevator, the deceased person
> pulled out a gun and so I reacted once I seen it and
> I shot him because I felt, you know, my life was, you
> know, in jeopardy. It was a housing project, a pretty
> rough housing project in Brooklyn, the Albany
> Houses. And after that, we ran away after the
> incident.

---

[1]    Petitioner had previously appeared before the Parole Board in December 2013. *Rhames v. Artus* ("*Artus*"), No. 14-CV-6642, Dkt. No. 1 (W.D.N.Y. filed Nov. 5, 2014). On that occasion the Parole Board denied petitioner parole, and he thereafter filed a petition for a writ of habeas corpus in federal court challenging that decision. *Artus*, No. 14-CV-6642, Dkt. No. 1. In that proceeding, petitioner contended that his constitutional rights were violated because the parole hearing was conducted by video. *Id.* Because petitioner failed to exhaust available state court remedies prior to filing the habeas action, District Judge Charles J. Siragusa denied and dismissed the petition on January 23, 2015. *Id.*, Dkt. No. 10.

*Id.* at 111-12.

During the parole hearing, petitioner also acknowledged his two prior felony convictions, and that he previously had his probation revoked. Dkt. No. 15-1 at 113. The Parole Board discussed with petitioner his two prison disciplinary violations since his last parole hearing, and petitioner was provided an opportunity to explain the circumstances of those violations and, more generally, why he believed he should be released from prison. *Id.* at 114-15, 118-19. The Parole Board also acknowledged during the hearing that (1) petitioner's Correctional Offender Management Profiling for Alternative Sanctions ("COMPAS") Risk Assessment showed that petitioner had a low risk of violence, arrest, and absconding;[2] (2) petitioner had secured housing for his potential release; and (3) petitioner had developed leads for securing employment following release. *Id.* at 113, 115-16.

Following the hearing, the Parole Board issued a decision denying petitioner parole. Dkt. No. 15-1 at 120. Because petitioner challenges the basis upon which the Parole Board rendered that decision, the entire

---

[2]     According to respondent, the Parole Board uses COMPAS instruments to satisfy the requirements under New York law concerning parole determinations. Dkt. No. 13 at 6 n.1 (citing N.Y. Exec. L. §§ 259-c(4), 259-i(2)(c)(A); *Applegate v. Annucci*, No. 16-CV-2187, 2017 WL 3049555, at *2 (S.D.N.Y. July 18, 2017)).

decision is recited below:

### D E C I S I O N

Denied 24 months. Next appearance, 12/17.

Parole is denied. After a review of the record and interview, the panel has determined that if released at this time there is a reasonable probability that you would not live at liberty without again violating the law.

This decision is based on the following factors:

The instant offense of Murder 2nd, Criminal Possession of a Weapon 2nd, and Criminal Possession of a Weapon 3rd, wherein you did cause the death of an individual by shooting him.

Your record dates back to approximately 1985. It includes felonies and misdemeanors as well as prior jail and failure at community supervision. You have failed to benefit from prior efforts at rehabilitation.

Note is made by this board of your sentencing minutes, COMPAS Case Plan, COMPAS Risk Assessment, rehabilitative efforts, letters of support and/or reasonable assurance, disciplinary record, and all other required factors.

Additionally, your release at this time would be incompatible with the welfare of society and would so deprecate the serious nature of the crime as to undermine respect for the law.

*Id.*

Petitioner appealed the Parole Board's decision to the Board of Parole Appeals Unit. Dkt. No. 15-1 at 148-60. In his appeal, petitioner argued, *inter alia*, that the Parole Board erroneously described the facts underlying his crimes. *Id.* at 149-50. Specifically, petitioner contended that the Parole Board's description that he *followed* the victim into a *residence or apartment* was factually incorrect, and that such a description

erroneously implied that the crimes involved a home invasion. *Id.* The

Board of Parole Appeals Unit rejected this argument and concluded that

the Parole Board was "mandated [under state law] to consider the report

and entitled to rely on the information contained in the report." *Id.* at 165.

On or about August 3, 2016, petitioner filed a *pro se* Article 78

petition in Franklin County Supreme Court challenging the Parole Board's

decision. Dkt. No. 15-1 at 10-23. Petitioner again argued, *inter alia*, that

the Parole Board's reliance on misstated facts concerning the murder was

an error. *Id.* at 12-13. On January 20, 2017, New York State Supreme

Court Justice S. Peter Feldstein dismissed the petition, concluding, in

relevant part, as follows:

> [I]t does not appear that the details of whether the
> petitioner followed the victim or if it occurred in an
> apartment or housing project were relevant to the
> Parole Board's determination as such facts were not
> stated in the decision nor would the different details
> substantially alter the underlying narrative of the crime
> for purposes of the parole hearing.

*Id.* at 185. Justice Feldstein also held that, in any event, the facts as stated

by the Parole Board were derived from the petitioner's presentence report,

on which the Parole Board was entitled to rely and which neither the

Parole Board nor the court could amend. *Id.* at 184. The court also noted

that petitioner was given an opportunity at the parole hearing and the

sentencing hearing to correct any erroneous facts. *Id.* at 184-85. Finally, the court held that the Parole Board considered the proper statutory factors and provided petitioner an opportunity to speak on his belief. *Id.* at 187. Petitioner did not appeal Justice Feldstein's decision to the New York State Supreme Court Appellate Division.

## II.   PROCEDURAL HISTORY

Petitioner commenced this proceeding on or about March 14, 2017. Dkt. No. 1. On August 10, 2017, respondent filed his answer and opposition to Rhames' petition through its counsel, the Office of the New York State Attorney General. Dkt. Nos. 13, 14. Accompanying respondent's answer and memorandum of law was a compilation of the relevant state court records. Dkt. No. 15. Petitioner subsequently filed a reply memorandum on August 22, 2017. Dkt. No. 18. The matter is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III.   DISCUSSION

In his petition, Rhames "challeng[es] federal due process and state statutory grounds the adequacy of various parole board procedures in violation of the due process clause and New York correction law 43, 212,

7

213, and 214." Dkt. No. 1 at 5 (errors in original). The allegations in the petition accuse the Parole Board of rendering its decision in reliance upon erroneous factual information. *Id.* Specifically, petitioner alleges that "[t]he parole board made up its own facts of the circumstances where the commissioner said the Petitioner followed the deceased into a residence or apartment as if it was an home invasion murder." *Id.* (errors in original).

Rhames' petition is subject to dismissal on three independent grounds, including that (1) the relief petitioner seeks is not available pursuant to 28 U.S.C. § 2254; (2) his claims are unexhausted and procedurally defaulted; and (3) his claims are meritless. For the sake of completeness, I will discuss below each basis for recommending that the petition be denied and dismissed in its entirety.

A.    Petitioner's Request for Relief

In his petition, Rhames states that, as relief, he seeks a "new parole hearing." Dkt. No. 1 at 12. He also characterizes his petition as a "[c]ivil rights complaint" and asserts that his due process rights were violated during the parole hearing on December 1, 2015. *Id.* at 5. In a subsequent letter filed with the court shortly after the commencement of this action, petitioner wrote, "I want it known that I am seeking federal due process on [sic] injunctive and declaratory relief rather than release from custody."

Dkt. No. 6 at 1.

The only remedy available in a habeas corpus proceeding brought pursuant to 28 U.S.C. § 2254 is release from the challenged confinement. *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) (holding that habeas corpus is the sole remedy when a state prisoner seeks "a speedier release from . . . imprisonment"); *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005) (finding that prisoners must use habeas corpus remedies "when they seek to invalidate the duration of their confinement"). Constitutional claims that do not impact the fact or length of an inmate's confinement, however, are more appropriately brought under 42 U.S.C. § 1983. *Wilkinson*, 544 U.S. at 82.

Petitioner's claim in this case, alleging that he was denied due process during a parole hearing, does not impact the fact or length of confinement because he seeks only prospective injunctive relief prohibiting the Parole Board from mischaracterizing the underlying facts of his crimes during the next parole hearing. That claim is therefore more appropriately asserted in a civil rights action under 42 U.S.C. § 1983. Dkt. No. 18; *see Wilkinson*, 544 U.S. at 76 (finding that 42 U.S.C. § 1983 is the proper vehicle for claims seeking injunctive and declaratory relief concerning the constitutionality of state parole procedures). Petitioner

explicitly foreclosed the possibility that he is challenging the fact of his confinement in a supplemental letter to the court and in his reply memorandum. Dkt. No. 6 at 1; Dkt. No. 18. Accordingly, I recommend that the habeas petition be dismissed on this ground.[3]

B.   Exhaustion of State Court Remedies

Prior to seeking federal habeas relief, a petitioner must exhaust available state remedies or establish either an absence of available state remedies or that such remedies cannot adequately protect his rights. *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994). The exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982); *see also Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005) ("Comity concerns lie at the core of the exhaustion requirement."). Though both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law.

---

[3]     Because, as is discussed more completely below, the petition is without merit, I recommend dismissal be with prejudice, rather than without prejudice in order to permit petitioner to refile the matter as a civil rights action pursuant to 42 U.S.C. § 1983.

*Galdamez*, 394 F.3d at 72 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999)). "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye*, 696 F.2d at 192 (footnote omitted).

This exhaustion requirement is satisfied if the federal claim has been "'fairly present[ed]'" to the state court. *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). A claim has been "fairly presented" if the state court was apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye*, 696 F.2d at 191. Thus, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.* at 192.

Before filing a federal habeas petition challenging a parole decision, a state prisoner must not only file an administrative appeal and a proceeding under Article 78 of the New York Civil Practice Law and Rules ("C.P.L.R."), but, following an unsuccessful Article 78 petition, the prisoner must appeal the Article 78 decision to the New York State Supreme Court Appellate Division and, if unsuccessful there, seek leave to appeal to the New York State Court of Appeals. *Lebron v. Annucci*, No. 15-CV-0829,

2016 WL 1312564, at *3 (N.D.N.Y. Apr. 4, 2016) (Sharpe, J.).[4]  Here,

although petitioner filed an Article 78 proceeding in Franklin County

Supreme Court, he did not appeal its dismissal to the Appellate Division.

Accordingly, petitioner's claims are unexhausted because the New York

State appellate courts have not had an opportunity to review petitioner's

claims on the merits.

After a court determines that a claim is unexhausted, it next must

consider whether the claim is procedurally defaulted. In the event an

exhausted claim is "barred by state law and. . . its presentation in the state

forum would [therefore] be futile[,] . . . [the federal habeas court]

theoretically has the power to deem the claim exhausted." *Aparicio*, 269

F.3d at 90. As the Second Circuit candidly noted, however,

> [t]his apparent salve. . . proves to be cold comfort
> to most petitioners because . . . when 'the
> petitioner failed to exhaust state remedies and the
> court to which the petitioner would be required to
> present his claims in order to meet the exhaustion
> requirement would now find the claims procedurally
> barred, federal habeas courts also must deem the
> claims procedurally defaulted.'

*Id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

In this case, petitioner had thirty days from the date on which he was

---

[4]      All unreported cases cited to in this report have been appended for the
convenience of the *pro se* petitioner.

served with the Article 78 decision to file a notice of appeal to the

Appellate Division. New York C.P.L.R. § 5513(a). Petitioner admits that he

did not file a notice of appeal, *see, e.g.,* Dkt. No. 1 at 6, and he is now

precluded from doing so under New York State law. C.P.L.R. § 5514(c).

Accordingly, petitioner's claim asserted in this action is procedurally

defaulted. *See Lebron*, 2016 WL 1312564, at *3 (finding that the

petitioner's claim challenging aspects of his parole board hearing was

procedurally defaulted where he did not timely file an appeal to the

Appellate Division and the time to do so had "long since past").

Once a claim has been deemed procedurally defaulted, it is subject

to dismissal unless the petitioner can demonstrate "cause for the default

and prejudice, or that failure to consider the claim will result in a

miscarriage of justice (i.e., the petitioner is actually innocent)." *Aparacio*,

269 F.3d at 90 (citing *Coleman*, 501 U.S. at 748-50); *Fama v. Comm'r of*

*Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000). To establish cause

sufficient to excuse a procedural default, a petitioner must show that

"some objective factor external to the defense impeded [his] efforts to

comply with the State's procedural rule." *Coleman*, 501 U.S. at 753;

*accord, Maples v. Thomas*, 565 U.S. 266, 281 (2012). When a petitioner

has failed to establish adequate cause for his procedural default, the court

need not examine the issue of prejudice because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

Petitioner in this case has not provided the court with any justification for his failure to exhaust the available state court remedies prior to filing his habeas petition. He contends that, because he is seeking injunctive and declaratory relief, he was not required to file an appeal to the Appellate Division following the denial of his Article 78 petition. Dkt. No. 1 at 6; Dkt. No. 18. This argument is patently meritless. The only remedy available for a habeas petition under 28 U.S.C. § 2254 (which is the procedural vehicle petitioner opted to use in this action) is release from custody.[5] *Wilkinson*, 544 U.S. at 78 (citing *Preiser*, 411 U.S. at 486). In addition, there is nothing before the court at this juncture to suggest that petitioner is actually innocent such that petitioner's claim should be considered under a "miscarriage of justice" analysis. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Accordingly, I recommend that petitioner's request

---

[5]      In addition, even assuming petitioner intended for his petition to be construed as asserting a civil rights complaint under 42 U.S.C. § 1983, it would have been subject to its own peculiar set of exhaustion requirements under the Prisoner Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996).

for a writ of habeas corpus be denied as unexhausted and procedurally defaulted.

C.   Merits of Petitioner's Claim

The petition in this case claims is grounded upon both constitutional and state statutory principles. Dkt. No. 1 at 5. With respect to the latter, petitioner alleges that the Parole Board's procedures violated New York Correction Law §§ 43, 212, 213, 214. *Id.* In a habeas matter, however, a federal court can only entertain a petition for a writ if the state prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991), *accord, Saracina v. Artus*, 452 F. App'x 44, 46 (2d Cir. 2011). Accordingly, petitioner's state-law claims are not cognizable under 28 U.S.C. § 2254, and I recommend they be dismissed on that basis.

Turning now to petitioner's constitutional due process claim, the "analysis . . . proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so, we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011). It is well settled

that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of the Ne. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979); *accord, Swarthout*, 562 U.S. at 220. "In order for a state prisoner to have an interest in parole that is protected by the Due Process Clause, he must have a legitimate expectancy of release that is grounded in the state's statutory scheme." *Barna v. Travis*, 239 F.3d 169, 170 (2d Cir. 2001); *accord, Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012).

In this case, petitioner's parole release is governed by New York Executive Law § 259-i, which provides, in relevant part, as follows:

> Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law.

N.Y. Exec. Law § 259-i(2)(c)(A). The Second Circuit has repeatedly announced that section 259-i does not confer upon New York State inmates a liberty interest in parole, "and the protections of the Due Process Clause are inapplicable," except to the extent that they extend a limited liberty interest to prisoners in "not being denied parole for arbitrary

or impermissible reasons[.]" *Graziano*, 689 F.3d at 115. A cognizable constitutional clam "must allege that [the petitioner was] denied parole based on an inappropriate consideration of a protected classification or an irrational distinction." *Id.* at 116.

Petitioner in this case does not contend that the Parole Board arbitrarily denied him parole or that its decision was discriminatory. Instead, he alleges that the Parole Board incorrectly recited the facts of his underlying crimes. Dkt. No. 1 at 5; Dkt. No. 18. Nonetheless, even assuming that petitioner's claim triggers a liberty interested, he was afforded an adequate opportunity to correct the Parole Board's recitation of the facts and provided with a decision explaining the Parole Board's denial. Dkt. No. 15-1 at 111-12, 118. Indeed, the Parole Board permitted petitioner to correct the alleged misstatement of the facts and later allowed petitioner to close the hearing with additional testimony on his behalf. *Id.*

Because petitioner's constitutional claims do not implicate a liberty interest, and, in any event, petitioner was afforded the process he was due under the constitution, I recommend his request for a writ of habeas corpus be denied on the merits.

D.    Certificate of Appealability

To appeal a final order denying a request by a state prisoner for habeas relief, a petitioner must obtain from the court a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A); *see also* Fed. R. App. P. 22(b)(1) ("[T]he applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."). In the absence of a COA, a federal court of appeals lacks jurisdiction to entertain an appeal from the denial of a habeas petition. *Hoffler v. Bezio*, 726 F.3d 144, 152 (2d Cir. 2013). A COA may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Hoffler*, 726 F.3d at 154. A petitioner may demonstrate a "substantial showing" if "the issues are debatable among jurists of reason; . . . a court could resolve the issues in a different manner; or . . . the questions are adequate to deserve encouragement to proceed further."[6] *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (quotation marks omitted).

In this instance, I conclude that petitioner has not made a substantial

---

[6]    A similar standard applies when a COA is sought to challenge the denial of a habeas petition on a procedural basis. *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000) ("[A] COA should issue . . . if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.").

showing of the denial of a constitutional right, and therefore recommend against the issuance of a COA.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

Petitioner now argues that his due process rights were violated when the Parole Board relied upon allegedly incorrect facts concerning petitioner's underlying crimes. That claim however, is not properly raised under 28 U.S.C. § 2254 because petitioner seeks only prospective injunctive and declaratory relief. In any event, moreover, the claim lacks merit and is procedurally defaulted. Accordingly, it is hereby respectfully

RECOMMENDED that the petition in this matter be DENIED and that a certificate of appealability not be issued.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[7]   FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.   6(a), 6(d),

---

[7]     If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge


Dated:      April 11, 2018
            Syracuse, New York

2016 WL 1312564
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Elvin Lebron, Petitioner,
v.
Anthony J. Annucci, Respondent.

9:15-CV-0829
|
Signed 04/04/2016

**Attorneys and Law Firms**

FOR THE PETITIONER: ELVIN LeBRON, 64972-054, Lewisburg U.S. Penitentiary, Inmate Mail/Parcels, P.O. Box 1000, Lewisburg, PA 17838, Petitioner, Pro Se.

FOR THE RESPONDENT: HON. ERIC T. SCHNEIDERMAN, Office of the Attorney General, 120 Broadway, OF COUNSEL: THOMAS B. LITSKY, Assistant Attorney General, New York, NY 10271, Attorney for Respondent.

**Opinion**

## DECISION AND ORDER

GARY L. SHARPE, Senior United States District Judge

### I. INTRODUCTION

Petitioner *pro se* Elvin LeBRON filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, dated July 8, 2015. Dkt. No. 1, Petition ("Pet.").[1] On October 5, 2015, petitioner filed, and the Court accepted, a Supplement to the Petition. Dkt. No. 11, Supplement to Petition ("Supp. Pet."). Petitioner was convicted of federal crimes while he was on parole for a prior state conviction. After petitioner pleaded guilty in federal court, respondent issued a parole violation warrant to the Federal Bureau of Prisons. Petitioner alleges he was entitled to a hearing after the warrant was issued and that his due process rights were violated when he was not afforded a speedy hearing. Pet. at 2-3, 7-9. Respondent opposes the petition. Dkt. No. 13, Answer; Dkt. No. 12, Memorandum of Law Supporting Response to Petition for Writ of Habeas Corpus ("Resp. Mem."); Dkt. No. 14,

State Court Records (SR).[2] Petitioner filed a Reply. Dkt. No. 15, Reply.

For the reasons that follow, the petition is denied and dismissed.

### II. BACKGROUND

In 1994, petitioner plead guilty in Supreme Court, New York County, to the crimes of Manslaughter in the First Degree, Robbery in the First Degree, and Criminal Possession of a Weapon in the Third Degree. *See People v. LeBron*, 238 A.D.2d 150 (1st Dep't 1997). At that time, he was sentenced to an indeterminate prison term of eleven to twenty-two years on the robbery conviction, and lesser, concurrent sentences on the remaining convictions. *Id.* The Appellate Division, First Department, unanimously affirmed the judgment of conviction, and the New York State Court of Appeals denied petitioner's application for leave to appeal. *LeBron*, 238 A.D.3d 150, *lv. denied*, 90 N.Y.2d 895 (1997).

On October 23, 2009, petitioner was conditionally released from prison to parole supervision by the New York State Department of Correctional Services (DOCS). SR 31-32; *LeBron v. Graham*, No. 9:09-CV-1021 (GLS), 2010 WL 2771878, at * 1.[3]

On April 13, 2011, petitioner was arrested on federal criminal charges while on parole. A Violation of Release Report, dated May 12, 2011, was submitted to the New York State Parole Board as a result of petitioner's arrest. SR 33-35, 38. Petitioner subsequently pleaded guilty and was convicted in the Southern District of New York of Conspiracy to Distribute and Possession with Intent to Distribute Crack, *see* 21 U.S.C. § 846. *Id.* at 42-43. Petitioner was sentenced to seventy months in prison and is currently in the custody of the United States Bureau of Prisons, and housed at the United States Penitentiary in Lewisburg, Pennsylvania. *Id.* Petitioner's projected release date is May 11, 2016. *Id.* at 36.

**\*2** On April 10, 2013, the New York State Parole Board held that, as a result of his federal conviction, petitioner was delinquent with regards to the conditions of his parole dating back to his arrest on April 13, 2011. *Id.* at 39. On April 11, 2013, DOCS issued Parole Warrant No. 64280 at the federal prison where petitioner was incarcerated. *Id.* at 49. Petitioner requested DOCS vacate the warrant,

which was denied on June 19, 2014. *Id.* at 9. Petitioner was informed that he would be brought back to New York pursuant to the warrant filed with the Federal Bureau of Prisons after he was released from federal custody and, at that time, a parole revocation hearing would be held. *Id.*

Petitioner then brought a New York CPLR Article 78 Petition in the Supreme Court, Albany County, on September 9, 2014. *Id.* at 1-9. Petitioner challenged DOCS June 19, 2014 decision which denied his request to vacate the parole warrant. Petitioner maintained he was denied his right to due process and equal protection because he did not receive a speedy parole hearing after DOCS issued the parole violation warrant. *Id.*

In a Decision and Order, dated February 23, 2015, Supreme Court denied the Article 78 petition. *Id.* at 52-56. Specifically, Supreme Court found that, pursuant to New York Executive Law § 259-i(3)(a)(iii), where the alleged parole violator is detained in another state pursuant to a parole warrant, the warrant "will not be deemed to be executed until the alleged violator is detained exclusively on the basis of such warrant." *Id.* at 54. Accordingly, Supreme Court concluded that DOCS "had no obligation to conduct a parole violation hearing while the petitioner was incarcerated in a federal prison in another state." *Id.* at 55.

DOCS served petitioner a copy of the Supreme Court Decision and Order on March 16, 2015, with notice of entry. *Id.* at 51-57. On May 17, 2015, petitioner filed a motion in the Appellate Division, Third Department, requesting an extension of time to appeal. *Id.* at 58-71. The Appellate Division denied petitioner's request in an Order dated July 30, 2015. *Id.* at 72.

Petitioner then sought leave to appeal to the Court of Appeals. *Id.* at 95-96. Respondent opposed the motion. *Id.* at 97-98. On November 24, 2015, the Court of Appeals dismissed petitioner's motion for leave to appeal on the ground that the order sought to be appealed from was not a final order determining the proceedings and therefore was not appealable. *LeBron v. Annucci*, 26 N.Y.3d 1058 (2015).

## III. DISCUSSION

### A. Exhaustion and Procedural Bar

Petitioner argues his constitutional right to due process was violated because he did not receive a speedy parole hearing after DOCS issued the parole violation warrant with the Federal Bureau of Prisons. Pet. at 7-9. Petitioner's claim, however, is not exhausted.

An application for a writ of habeas corpus may not be granted until a petitioner has exhausted all remedies available in state court. 28 U.S.C.A. § 2254(b). T his requirement is not satisfied unless each federal claim is "fairly presented" to the state courts. 28 U.S.C. § 2254(b), (c); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (explaining that a petitioner seeking federal habeas relief must raise all claims in state court prior to raising them in the habeas corpus petition, and he must "fairly present" each federal claim in the appropriate state court, "thereby alerting that court to the federal nature of the claim").

A petitioner seeking habeas review of his parole revocation is subject to the exhaustion doctrine. *See Cook v. New York State Div. of Parole*, 321 F.3d 274, 278 (2003) (finding a state prisoner challenging his parole revocation must bring a habeas proceeding pursuant to section 2254); *McQueen v. Superintendent, Franklin Corr. Facility*, No. 9:15-CV-77 (JKS), 2015 W L 6449138, at *4 (N.D.N.Y. Oct. 23, 2015) ("Like petitions challenging criminal convictions, habeas petitions addressing parole revocations are subject to the aforementioned exhaustion requirements").

**\*3** "To exhaust a denial of parole under New York law, the inmate must first file an administrative appeal with the Division of Parole's Appeals Unit. If that appeal is denied, he must seek relief in state court pursuant to Article 78." *Johnson v. Carlsen*, No. 9:09-CV-66 (GTS/DRH), 2010 WL 1817343, at *2 (N.D.N.Y. Mar. 29, 2010) (internal quotation marks omitted); *McCullough v. NYS Div. of Parole*, No. 9:11-CV-1112 (DNH/DEP), 2015 W L 2340784, at *4 (N.D.N.Y. Apr. 15, 2015) ("The typical path for exhausting a claim concerning a petitioner's parole revocation proceeding includes both completion of the internal, administrative appeal process within the Division of Parole and, in the event of an adverse determination, commencement of a CPLR Article 78 proceeding"). "If the Article 78 petition is denied, the petitioner must appeal that denial to the 'highest state court capable of reviewing it.'" *Scales v. New York State Div. of Parole*, 396 F. Supp. 2d 423, 428 (S.D.N.Y. 2005)

(quoting *Cotto v. Herbert*, 331 F.3d 217, 237 (2d Cir. 2003)).

Here, although petitioner filed an Article 78 proceeding in state court, he did not timely appeal Supreme Court's denial of his Article 78 petition to the highest court capable of reviewing it. Pursuant to Section 5513(a) of New York's Civil Practice Laws and Rules, an appeal in state court "must be taken within thirty days after service by a party upon the appellant of a copy of the judgment or order appealed from and written notice of its entry." Respondent served petitioner a copy of Supreme Court's decision denying his Article 78 petition on March 16, 2015, with notice of entry. SR at 100-06. Petitioner did not file a notice of appeal within thirty days, but instead waited sixty-two days until May 17, 2015, to request an extension of time to take an appeal. *Id.* at 58-71. The Appellate Division denied petitioner's request for an extension of time to appeal, (*id.* at 72), and the Court of Appeals concluded it could not review the Appellate Division's order because the order did "not finally determine the proceeding within the meaning of the Constitution." *Lebron v. Annucci*, 26 N.Y.3d at 1058. Accordingly, petitioner's claims are unexhausted because the state appellate courts have not reviewed petitioner's claims on the merits.

Petitioner's claims may be deemed exhausted however, because petitioner no longer has a remaining avenue to raise the claims in state court due to his procedural default. *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (" When a claim has never been presented to a state court, a federal court may theoretically find that there is an 'absence of available State corrective process' under § 2254(b)(1)(B)(I) if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile"). The dismissal of petitioner's Article 78 proceeding was subject to an appeal to the Appellate Division, and an application for leave to appeal to the Court of Appeals. Because the time to appeal has long since past, and petitioner is now foreclosed from pursuing such appeals in state court, the Court deems petitioner's instant claims exhausted, but procedurally defaulted.

A procedural default does not automatically bar a petitioner from habeas relief if the petitioner can show cause for the default and actual resulting prejudice, or that the denial of habeas relief would result in a fundamental miscarriage of justice, i.e., that he is actually innocent. *House v. Bell*, 547 U.S. 518, 536-39 (2006); *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *see Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (" Actual innocence means factual innocence, not mere legal insufficiency.") (internal citation omitted). To establish cause, a petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule. *Maples v. Thomas*, 132 S. Ct. 912, 922 (2012); *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). If a petitioner fails to establish cause, a court need not decide whether he suffered actual prejudice, because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) (referring to the "cause-and-prejudice standard"); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

**\*4** Petitioner's only attempt to show cause is claiming that all his "personal property was packed for forwarding" to the prison where he now resides near the time that Supreme Court dismissed his Article 78 petition, and that he did not receive these personal items back until after the time to appeal had passed. Reply at 3-4. According to petitioner, he also did not have "at will access" to the prison's law library computers, and did not otherwise have "access to state law." *Id.* at 4.

These contentions are insufficient to establish "cause." Petitioner does not indicate how his lack of "at will access" to the law library computers prevented him from timely filing a notice of appeal. Nor does petitioner identify what materials were transferred, or how his inability to access the packed materials impeded him from filing a timely notice of appeal. Furthermore, respondent served Supreme Court's decision dismissing his Article 78 petition on March 16, 2015, ten days before he was transferred to another facility on March 26, 2015. SR at 100-06; Reply at 2. Petitioner provides no explanation for why he could not file a notice of appeal during that ten-day period after he received the Supreme Court's decision. As such, petitioner has not demonstrated cause for his default, and the Court need not consider whether petitioner demonstrated prejudice. *See Murray v. Carrier*, 477 U.S. at 496; *Stepney v. Lopes*, 760 F.2d at 45.

Finally, petitioner does not allege "actual innocence;" therefore, this Court's decision to not review his claims will not result in a miscarriage of justice. *Calderon v.*

*Thompson*, 523 U.S. 538, 559 (1998) (internal quotation omitted) ("The miscarriage of justice exception is concerned with actual as compared to legal innocence"). Petitioner has not presented any new evidence that he is actually innocent, or that the failure to review his claim would result in a fundamental miscarriage of justice. *House*, 547 U.S. at 536-39; *Schlup*, 513 U.S. at 327. Accordingly, petitioner's claims that he was denied due process because he did not receive a speedy parole hearing are procedurally barred from habeas review. Nevertheless, out of an abundance of caution, the Court has reviewed the merits of the petition and, for the reasons that follow, finds them lacking.

**B. Standard of Review on the Merits**
Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme Court's precedents.'" *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see Metrish v. Lancaster*, 133 S. Ct. 1781, 1787 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement'") (quoting *Richter*, 562 U.S. at 103).

*5 Additionally, the AEDPA foreclosed "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012) (per curiam) (quoting *Renico*, 559 U.S. at 779). A state court's findings are not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold." *Schriro*, 550 U.S. at 473.

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with "'clear and convincing evidence.'" *Schriro*, 550 U.S. at 473-74 (quoting § 2254(e)(1)). Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013).

**C. Due Process Claim**
Petitioner maintains that his constitutional due process rights were violated because he was not afforded a speedy parole revocation hearing after DOCS issued a parole violation warrant to the Federal Bureau of Prisons. Dkt. No. 1, Pet. at 7-9.

It is well settled that "the constitutional freedom of a parolee generated by statute is a liberty interest protected by the Due Process Clause of the Fourteenth Amendment which may not be terminated absent appropriate due process safeguards." *Moody v. Daggett*, 429 U.S. 78, 85-86 (1976) (citing *Morrissey v. Brewer*, 408 U.S. 471 (1972)). Among the due process rights afforded is "the right to a hearing at which the court determines two issues: whether the [parolee] violated a condition of [parole] as a matter of fact and, if so, whether this fact warrants revocation." *United States v. Jetter*, 577 F. App'x 5, 7 (2d Cir. 2014) (quoting *United States v. Sanchez*, 225 F.3d 172, 175 (2d Cir. 2000)). Due process also requires that a person accused of violating parole must receive a revocation hearing "within a reasonable time after [the person] is taken into custody." *Morrissey*, 408 U.S. at 488.

In *Moody v. Daggett*, 429 U.S. 78 (1976), the Supreme Court held that the revocation hearing mandated in *Morrissey* "is required only after the person charged with violating parole is taken into custody for the parole violation, and that the issuance of a warrant and the lodging of a detainer, while the person is incarcerated elsewhere for a separate crime, do not constitute being taken into custody." *United States v. Wall*, 208 F.3d 204, *2 (2d Cir. 2000) (citing *Moody*, 429 U.S. at 86-87). Simply stated, "it is the *execution* of the warrant, after termination of the intervening sentence, that takes the person into custody for the parole violation and triggers the obligation for a *Morrissey* hearing." *Id.* (citing *Moody*, 429 U.S. at 89) (emphasis in original); *United States v. Ramos*, 401 F.3d 111, 115 (2d Cir. 2005) (" After an arrest warrant for a parolee or releasee has been issued on the basis of his or her parole or supervised release violation, there is 'no constitutional duty to provide [the parolee] an adversary parole hearing until he is taken into custody as a parole violator by execution of the warrant.'") (quoting *Moody*, 429 U.S. at 89.); *Jetter*, 577 F. App'x at *7 ("The Supreme Court has held that 'execution of the warrant and custody under that warrant [is] the operative event triggering any loss of liberty attendant upon parole revocation.'") (quoting *Moody*, 429 U.S. at 87).

 *6 In New York, when a parole violation warrant is executed, DOCS must provide the alleged parole violator a preliminary revocation hearing within fifteen (15) days. *See* Executive Law § 259-i(3)(c)(I). However, where an alleged parole violator is "detained in another state pursuant to such warrant ... the warrant will not be deemed executed until the alleged violator is detained exclusively on the basis of such warrant and the department has received notification that the alleged violation (A) formally waived extradition to this state or (B) has been ordered extradited to this state pursuant to a judicial determination." Executive Law § 259-i(3)(a)(iii). In other words, the warrant is only "deemed to be executed" once the violator is within the control of DOCS. *Id.* Accordingly, when DOCS "lodges a detainer against an alleged violator in an out-of-state facility, the 15-day period is not triggered until the individual has completed the out-of-state sentence and is available for extradition." *People ex rel. Matthews v. New York State Div. of Parole*, 95 N.Y.2d 640, 645 (2001).

Here, petitioner was on parole when he was arrested on federal criminal charges in 2011. After petitioner pleaded

guilty and was convicted of certain charges in the Southern District of New York, DOCS issued a parole violation warrant in 2013 to the Federal Bureau of Prisons. Since petitioner has not completed his federal sentence yet, the parole violation warrant has not been executed. Petitioner is not being detained in federal prison pursuant to the parole violation warrant, and therefore, the right to a *Morrissey* hearing has not been triggered. *See* Executive Law § 259-i(3)(a)(iii); *see also United States v. Wall,* 208 F.3d at *2 (holding that the lapse of time between the issuance of the federal warrant in 1992 and its execution in 1998 was "of no constitutional significance" because it is the execution of the warrant after termination of the intervening sentence that takes the person into custody and triggers the due process rights to a hearing).

To the extent that petitioner argues he is now subject to "higher federal security housing" and cannot participate in "Federal half-way house early release placement" as a result of issuance of the parole violation warrant, the claim fails. Pet. at 9. The petitioner in *Moody* raised a similar claim, arguing that a detainer issued in connection with his parole revocation adversely affected his prison classification and ability to qualify for certain programs. *Moody*, 429 U.S. at 88. The Supreme Court held that prison officials have discretion in controlling the conditions of confinement and that the petitioner had " no legitimate statutory or constitutional entitlement sufficient to invoke due process." *Id.* at 88, n.9. Accordingly, that petitioner is now subject to higher federal security housing classifications as a result of the issuance of a parole violation warrant does not set forth a constitutional due process claim. *Id.*

Finally, to the extent petitioner contends his "New York State Constitutional right to a timely and speedy hearing, as required by the due process and equal protection clauses of New York State" were violated, (Pet. at 8), or that his parole revocation warrant should be vacated as "void" because his state sentence was set to end in September 2015, (Supp. Pet. at 1), the Court finds such claims are not cognizable on habeas review. *see Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law."). As the Second Circuit has concluded, " it is not the province of a federal habeas court to reexamine ... determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United

States." *Id. at* 67-68; *see Gittens v. Thomas*, No. 7:02-CV-9435, 2003 WL 21277151, at *2 (S.D.N.Y. May 30, 2003) (finding the petitioner's claim that the parole board did not properly apply state law did not present a federal question subject to habeas review).

**\*7** In sum, the Court finds petitioner's claims are exhausted but procedurally defaulted, and otherwise lack merit or are not cognizable on habeas review. The petition is therefore denied and dismissed.

## IV. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the petition (Dkt. No. 1) and supplemental petition (Dkt. No. 11) are **DENIED AND DISMISSED**; and it is further

**ORDERED** that no Certificate of Appealability (COA) shall issue because petitioner failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires. [4] Any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

**ORDERED** that the Clerk serve copies of this Decision and Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 1312564

---

Footnotes

1    The cited page numbers for the petition refer to those generated by the court's electronic filing system (ECF).

2    The cited page numbers for the Answer (Dkt. No. 13), Respondent's Memorandum of Law (Dkt. No. 12), and Petitioner's Reply (Dkt. No. 15) refer to those generated by ECF. The "SR" page numbers for the state court records filed at Docket Number 14 appear at the top center of each page.

3    Petitioner previously filed a habeas petition on September 4, 2009, asserting claims that his parole applications were wrongfully denied. *LeBron*, 2010 WL 2771878, at *1. The petition was dismissed as moot because petitioner was conditionally released on parole at the time of the court's decision. *Id.*

4    *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *See Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that, if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, and (2) that the applicant has established a valid constitutional violation" (citation omitted)).

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Bradford APPLEGATE, Plaintiff,
v.
Anthony J. ANNUCCI, et al., Defendants.
No. 9:02-CV-0276 (LEK/DEP).

July 10, 2008.
Bradford Applegate, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General
State of New York, Megan M. Brown, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on June 2, 2008, by the
Honorable David E. Peebles, United States Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of
the Northern District of New York. Report-Rec. (Dkt. No.
53).

Within ten days, excluding weekends and holidays,
after a party has been served with a copy of a Magistrate
Judge's Report-Recommendation, the party "may serve
and file specific, written objections to the proposed
findings and recommendations," FED. R. CIV. P. 72(b),
in compliance with L.R. 72.1. No objections have been
raised in the allotted time with respect to Judge Peeble's
Report-Recommendation. Furthermore, after examining
the record, the Court has determined that the
Report-Recommendation is not subject to attack for plain
error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt.

No. 53) is **APPROVED** and **ADOPTED** in its
**ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary
judgment (Dkt. No. 52) is **GRANTED** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1)
is **DISMISSED** in its entirety, without prejudice against
defendant C .O. Gardner, but otherwise with prejudice;
and it is further

**ORDERED,** that the Clerk serve a copy of this Order
on all parties.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Bradford Applegate, a New York State
prison inmate who is proceeding *pro se* and *in forma
pauperis,* has commenced this civil rights action pursuant
to 42 U.S.C. § 1983 against the Deputy Commissioner and
General Counsel of the New York State Department of
Correctional Services ("DOCS") and several other DOCS
employees, complaining of diverse constitutional
violations alleged to have occurred during the time of his
confinement. In his complaint, Applegate asserts claims
stemming from various events at three separate
correctional facilities alleging *inter alia,* the use of
excessive force, acts of retaliation, deprivation of
procedural due process, and interference with
communications relating to legal matters, and seeks
recovery of compensatory and punitive damages.

Certain of plaintiff's claims were previously dismissed
by the court for failure to state a claim upon which relief
may be granted. Now that issue has been joined and
pretrial discovery has concluded, the defendants remaining
in the action have moved for summary judgment
requesting dismissal of the balance of plaintiff's claims,
both procedurally based upon his failure to properly
exhaust available administrative remedies with regard to
a majority of his causes of action, and on the merits. For

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

the reasons set forth below I recommend that the motion, which plaintiff has not opposed, be granted and that Applegate's remaining claims be dismissed.

### I. *BACKGROUND*

At the times relevant to his complaint, plaintiff was a New York State prison inmate entrusted into the custody of the DOCS. *See* Generally Complaint (Dkt. No. 1). Beginning in or around May of 1998, plaintiff was assigned to the Greenhaven Correctional Facility ("Greenhaven"). *Id.* ¶¶ 22-23. Plaintiff was later transferred into the Upstate Correctional Facility ("Upstate") in July of 1999, where he remained until December, 1999 when he was reassigned to the Elmira Correctional Facility ("Elmira").[FN1] *Id.* ¶¶ 56, 74.

> FN1. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

**\*2** Plaintiff's complaint in this action chronicles several instances of alleged harassment and retaliatory conduct on the part of prison officials; many of the incidents of which he now complains are attributed by the plaintiff to retaliatory motivation based upon his commencement and prosecution of another civil rights action in this district, *Applegate v. Mann, et al.,* Civil Action No. 98-CV-0067 (N.D.N.Y., filed in 1998) (*"Applegate I"*). Complaint (Dkt. No. 1) ¶ 3. The first incident of which the plaintiff complains occurred shortly after his transfer into Greenhaven, when his typewriter was destroyed and the "vast majority" of his legal papers were taken from him. Complaint (Dkt. No. 1) ¶ 23. With this exception, however, plaintiff's existence at Greenhaven was apparently fairly uneventful until September 11, 1998, when he amended his complaint in *Applegate I* to challenge an earlier special housing unit ("SHU") disciplinary confinement-an action which, he maintains, led defendant S. Carlson, a corrections officer at Greenhaven, to initiate a "campaign of relentless harassment" against him, including "constant pat-frisks[.]" *Id.* ¶ 26. Plaintiff asserts that defendant Carlson's regimen

of harassment also included the issuance of a false misbehavior report on January 25, 1999, accusing him of smuggling and stealing toilet paper.[FN2] *Id.* ¶ 27.

> FN2. Plaintiff's claims relating to the allegedly false misbehavior report were previously dismissed by the court. *See* Report and Recommendation dated September 21, 2005 (Dkt. No. 38) at pp. 16-19, affirmed as modified by decision and order issued by District Judge Lawrence E. Kahn on February 6, 2006 (Dkt. No. 40).

After sending a letter on February 21, 1999 to Greenhaven Superintendent C. Artuz complaining of Corrections Officer Carlson's conduct, the harassment experienced by the plaintiff escalated. Complaint (Dkt. No. 1) ¶¶ 30-38. Plaintiff was pat-frisked on March 4, 1999 by defendant Carlson as part of a routine security measure implemented for inmates returning to their cell blocks from their workstations in order to detect weapons and other materials attempted to be smuggled out of the area. Carlson Aff. (Dkt. No. 52-13) ¶¶ 14-25; Complaint (Dkt. No. 1) ¶¶ 36-37. Plaintiff asserts that during the course of that pat-frisk defendant Carlson "savagely grabbed [him] by the back of his shirt and attempted to slam his face into the wall." Complaint (Dkt. No. 1) ¶¶ 36-37. Defendant Carlson vociferously denies that allegation, countering that during the course of the March 4, 1999 pat-frisk Applegate engaged in provocative behavior, taking his hands off of the wall where he had been instructed to place them, and turning toward the left prior to conclusion of the pat-frisk, necessitating that Carlson take appropriate counter-measures to ensure the safety and security of corrections officers and other inmates present in the area at the time. Carlson Aff. (Dkt. No. 52-13) ¶¶ 14-23. Defendant Carlson denies having used unnecessary force during the encounter, and specifically denies attempting to push Applegate's face in the wall or otherwise cause him harm. *Id.* ¶ 19. Plaintiff was not injured as a result of the incident. Brown Aff. (Dkt. No. 52-4), Exh. A at 55.

**\*3** Following the incident plaintiff was issued a misbehavior report alleging that he had engaged in violent conduct (Disciplinary Rule 104.11), violated a direct order

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

(Disciplinary Rule 106.10), engaged in physical interference with a corrections officer (Disciplinary Rule 107.10), and violated prison policies related to searches and frisks (Disciplinary Rule 115.10). Complaint (Dkt. No. 1) ¶ 40; Carlson Aff. (Dkt. No. 52-13) ¶ 27. Following a Tier II hearing conducted by defendant G. Schneider beginning on March 7, 1999, plaintiff was found guilty of all charges set forth in the misbehavior report, and sentenced to a period of thirty days of keeplock confinement.[FN3,FN4] Complaint (Dkt. No. 1) ¶ 45. That determination was affirmed on appeal to First Deputy Superintendent Dennis Bliden on March 18, 1999. Complaint (Dkt. No. 1) ¶ 48.

> FN3. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

> FN4. Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989)* (citing *Gittens* ); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). An inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.*

Inmates can leave their cells for showers, visits, medical exams and counseling. *Id* . Inmates can have cell study, books and periodicals. *Id.* The main difference between keeplock and the general population is that keeplocked inmates do not leave their cell for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

In or about April of 1999, following an altercation involving several inmates at Greenhaven, plaintiff was charged with participating in the fight and with possession of a weapon based upon the discovery of a sharpened can-top which, he contends, "was planted on his person by prison guards[.]" Complaint (Dkt. No. 1) ¶ 54. Although plaintiff's complaint provides no specifics regarding any ensuing disciplinary proceedings, he was apparently found guilty, following a hearing, of multiple infractions and sentenced to a period of seventy-five days of keeplock confinement for fighting, and an additional six months of SHU confinement based upon the weapon possession charge. *Id.* ¶ 55.

In mid-July of 1999, plaintiff was transferred to Upstate and placed in that facility's SHU. Plaintiff maintains that while there he was deprived of law library materials for a period of over three months, and during that time was hampered in his ability to pursue a state court application to vacate his state court judgment of conviction and to pursue discovery in *Applegate I.* Complaint (Dkt. No. 1) ¶¶ 57-71.

In or about December of 1999, after serving his full keeplock and SHU sentences at Upstate, plaintiff was transferred into Elmira. *Id.* ¶ 74. There, following a fight in March of 2000 involving the plaintiff, a search of his cell revealed an unworked length of metal, claimed by him to have been planted in his locker by staff members. *Id.* ¶ 75. Plaintiff attributes the incident to his "repeated attempts" to amend or supplement his complaint in *Applegate I. Id.* Although once again plaintiff's complaint is lacking in specifics in this regard, disciplinary charges were apparently lodged against him as a result of the incident, leading to the imposition of thirty days of keeplock confinement for fighting and 150 days of SHU confinement for possession of a weapon. *Id.* ¶ 76.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on February 26, 2002.[FN5] Dkt. No. 1. Named as defendants in plaintiff's complaint are Anthony J. Annucci, Esq., the DOCS Deputy Commissioner and General Counsel; Corrections Officer S. Carlson, Deputy Superintendent of Security Schneider, Corrections Lieutenant G. Schneider, and Corrections Lieutenant A. Pelc, all of whom were employed at the relevant times at Greenhaven; Deputy Superintendent of Programs R. Santor, Superintendent T. Ricks, and Corrections Officer Gardner, all of whom worked at Upstate during the relevant times; and Superintendent F.G. Bennett, Jr. and Deputy Superintendent of Administrative Services William J. Hopkins, both assigned to Elmira.

> FN5. Plaintiff's complaint was initially dismissed by the court based upon his failure to comply with a directive that he file an amended complaint eliminating the excessive and unnecessary details set forth in the original pleading. *See* Dkt. No. 10. The judgment entered dismissing plaintiff's complaint on this ground was later reversed on appeal to the United States Court of Appeals for the Second Circuit, and the matter was remanded to this court for further appropriate proceedings. Dkt. No. 13. In its summary order, which was subsequently issued as a mandate on July 9, 2004, the Second Circuit noted that on remand the district court would be authorized by Rule 12(f) of the Federal Rules of Civil Procedure to strike any portions of the complaint deemed to be redundant or immaterial, citing *Salahuddin v. Cuomo,* 861 F.2d 40, 42-43 (2d Cir.1988). Dkt. No. 13. In their earlier dismissal motion, however, defendants chose not to avail themselves of this mechanism for eliminating portions of plaintiff's complaint, which extends over twenty-eight typewritten pages and contains 102 paragraphs.

**\*4** Following service of the summons and complaint and reinstatement of the action by the Second Circuit, defendants moved on February 28, 2005 seeking dismissal on a variety of grounds including, *inter alia,* the applicable statute of limitations, lack of personal involvement, and the general failure of plaintiff's complaint to set forth a claim upon which relief may be granted.[FN6] Dkt. No. 35. That motion, which was not opposed, led to the issuance on September 21, 2005 of a report in which I recommended dismissal of certain of plaintiff's claims on various grounds. Dkt. No. 38. The report was adopted, with slight modification, by Senior District Judge Lawrence E. Kahn in a decision and order issued on February 2, 2006. Dkt. No. 40. As a result of the issuance of my report and Judge Kahn's order, the claims which remain in the action include causes of action for retaliation, a portion of plaintiff's original claim related to denial of access to the courts, a procedural due process cause of action stemming from disciplinary proceedings at Elmira, and an excessive force claim. The defendants remaining in the action following the issuance of that decision include defendants Annucci, S. Carlson, Deputy Superintendent of Security G. Schneider, and Corrections Officers A. Pelc, Gardner and F.G. Bennett, Jr.[FN7,FN8]

> FN6. In their pre-answer motion, defendants also asserted entitlement to qualified immunity-an argument which was not directed toward any particular cause of action.

> FN7. As will be seen, Lieutenant G. Schneider and Corrections Officer Gardner, though named as defendants, have never been served in the action and are thus not presently before the court. *See* pp. 11-16, *post.*

> FN8. While my initial report recommended dismissal of plaintiff's claims against defendant R. Santor, based upon lack of personal involvement, and that portion of my report appears to have been adopted by Senior District Judge Lawrence E. Kahn, the docket sheet was not modified to reflect this fact. The clerk's office is hereby directed to amend its records to reflect that all of plaintiff's claims against defendant R. Santor have been dismissed by the court.

Now that pretrial discovery, which included the taking of plaintiff's deposition, has been completed the remaining

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

defendants having appeared in the action have moved for the entry of summary judgment dismissing plaintiff's remaining claims. Dkt. No. 52. In their motion, defendants assert that with the exception of plaintiff's denial of court access claim, each of plaintiff's causes of action is procedurally barred based upon his failure to exhaust available administrative remedies before commencing suit. *Id.* Defendants also contend that plaintiff's remaining claims are lacking in merit, as a matter of law, additionally asserting a lack of personal involvement on the part of defendant F.G. Bennett, Jr., the Superintendent at Elmira, in the constitutional deprivations alleged, and renew their claim of entitlement to qualified immunity. *Id.* Defendants' motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[FN9] *See also* Fed.R.Civ.P. 72(b).

> FN9. The motion papers served upon the plaintiff and filed with the court include the requisite notice pursuant to Northern District of New York Local Rule 56.2, apprising him of the potential consequences of his failure to oppose defendants' motion. *See* Dkt. No. 52-2.

## III. *DISCUSSION*

### A. *Dismissal Of Unserved Defendants*

Following the return of this matter to this court from the Second Circuit, summonses were issued by the clerk on September 2, 2004 and forwarded for service to the United States Marshals Service.[FN10] *See* Dkt. No. 14. On November 19, 2004 the summonses were returned as unexecuted with regard to certain of the defendants, including Corrections Officers Sean Carlson, Ralph Santor, William Hopkins, Arlon Pelc and Gardner. Dkt. No. 17. Accompanying that return was a letter advising that the DOCS was unable to identify the employee designated by the plaintiff only by the last name of Gardner, noting that there are several DOCS workers with that last name.[FN11] *Id.* The docket sheet discloses neither a return of an acknowledgment of service by the other remaining unserved defendant, Lieutenant G. Schneider, nor a return of service reflecting the failure to serve that

individual. Defendants now seek dismissal of plaintiff's claims with regard to both of the two unserved defendants, including Lieutenant G. Schneider and Corrections Officer Gardner.

> FN10. According to the court's records, those summonses were later reissued on October 28, 2004.

> FN11. According to that letter the summonses were re-sent to defendants Santor, Hopkins, Carlson and Pelc, and those four defendants have since appeared in the action.

**\*5** Defendant's request is bottomed upon the requirement, imposed by Rule 4(m) of the Federal Rules of Civil Procedure, that service be made within 120 days of issuance of the summons, absent a court order extending that period.[FN12] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v.. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See* Zapata, 502 F.3d at 197.

> FN12. That rule provides that

> > [i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

an appropriate period....

Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of a case on its merits rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* such as is the case in this instance, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, thereby relieving the plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint. *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996). That does not mean, however, that a *pro se* plaintiff may stand idly by upon being notified that efforts by the U.S. Marshals Service to serve a particular defendant have been unsuccessful. *VanDiver v. Martin,* 304 F.Supp.2d 934, 938-43 (E.D.Mich.2004). In such instances it is incumbent upon the plaintiff to develop, though pretrial discovery or otherwise, any additional information necessary to permit service by the United States Marshals Service. *See VanDiver,* 304 F.Supp.2d at 942.

In this case defendant Gardner has not been served or otherwise appeared in the action within the appropriate time period. Based upon a review of the record I am unable to find good cause justifying plaintiff's failure to effectuate timely service, and find no sufficient basis presented to exercise discretion in favor of extending the governing period of service. Accordingly, since this court has never acquired jurisdiction over him, I recommend dismissal of the complaint as against defendant Gardner, without prejudice. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citing *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

**\*6** The situation is distinctly different with regard to Lieutenant G. Schneider. The fact that two individuals, apparently husband and wife, named G. Schneider are listed as defendants in this case has engendered considerable confusion on all levels. While it appears that Deputy Superintendent of Security G. Schneider has been served, Lieutenant G. Schneider has not, although the summons issued to that individual was not returned as unexecuted. It also appears that letters received by the court from the defendants' counsel requesting extensions of time to answer have furthered that confusion, not clearly referencing which G. Schneider is among the persons on whose behalf the requests have been made. *See* Dkt. Nos. 28, 33. And, while defendants' notice of motion in support of their earlier dismissal motion refers to the defendant as "George Schneider" without indicating whether it is Deputy Superintendent of Security G. Schneider or Lieutenant G. Schneider, as defendants' counsel herself acknowledges both G. Schneiders were referenced in her objections filed to the report and recommendation issued in the case. *See* Dkt. No. 39. Under these circumstances I recommend against dismissal of plaintiff's claims against defendant Lt. G. Schneider on the basis of failure to serve.[FN13]

> FN13. The fact that the two defendants named G. Schneider appear to be related and work at the same DOCS facility is strongly suggestive of awareness on the part of a Lieutenant G. Schneider of the pendency of this action and the assertion of claims against him or her. While not intended to minimize the importance of obtaining personal jurisdiction over a named defendant, I am therefore satisfied that no significant due process concerns are presented by failing to dismiss this action against Lieutenant G. Schneider on this procedural ground.

**B.** *Significance Of Plaintiff's Failure To Properly Oppose Defendants' Motion*

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that omission automatically entitles defendants to dismissal of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

Applegate's complaint, based upon their motion.
    This court's rules provide that

[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

    N.D.N.Y.L.R. 7.1(b)(3). While *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N .Y.1997) (McAvoy, C.J.)), the failure of such a plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). As can be seen by the face of Local Rule 7.1(b)(3), however, before summary judgment can be granted under such circumstances the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

    *7 Although a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[FN14] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also*

*Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that when reviewing defendants' motion for facial sufficiency, the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement.

> FN14. According to Local Rule 7.1(a)(3), "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3).

C. *Summary Judgment Standard*

    Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins., 391 F.3d at 83.* In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*8** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

D. *Failure To Exhaust*

In their motion defendants assert that with the exception of his court access claims, which appear to have been the subject of more than one grievance filed over time, plaintiff's claims are procedurally barred based upon his failure to exhaust available, administrative remedies before commencing suit. While acknowledging that some of plaintiff's claims, including claims of harassment, were the subject of letters allegedly written by the plaintiff to prison officials, defendants assert that those letters do not act as a surrogate for the filing and pursuit to completion of a grievance.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several

restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at \*5-6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

**\*9** The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias, 495 F.3d at 43* (quoting *Johnson, 380 F.3d at 697-98*) (emphasis omitted).

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed algorythm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias, 495 F.3d at 41; Hemphill, 380 F.3d at 686.* If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions, by preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Macias, 495 F.3d at 41; Hemphill, 380 F.3d at 686.* In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[FN15] *Macias, 495 F.3d at 41; Hemphill, 380 F.3d at 686.*

> FN15. In practicality these three prongs of the prescribed test, though intellectually distinct, plainly admit of significant overlap. *See Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *8 n .14 (E.D.N.Y. Jan. 31, 2007); *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

1. *Availability of Remedy*

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the Department of Correctional Services ("DOCS"), and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[FN16] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701 .4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id. § 701.5(c).* The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id. § 701.5(d).* Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

> FN16. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

*10 Certain of plaintiff's claims implicate misconduct on the part of corrections officials. In addition to the established IGP described above, the DOCS has implemented an expedited grievance process to address complaints of alleged staff harassment.[FN17] 7 N.Y.C.R.R. § 701.8; *see Perez v. Blott,* 195 F.Supp.2d 539, 543 (S.D.N.Y.2002) (describing expedited grievance process under prior relevant regulation, 7 N.Y.C.R.R. § 701.11, which has since been re-codified). This expedited process is not exclusive, and does not preclude the filing of an ordinary grievance in the event of perceived staff harassment or retaliation. *See* Bellamy Decl. (Dkt. No. 52-15) ¶¶ 13, 17; *see also* 7 N.Y.C.R.R. § 701.8(a).[FN18] An inmate claiming harassment by a DOCS worker must file a grievance, which is then assigned a grievance number and, in the event of allegations of staff harassment, forwarded to the superintendent of the facility. 7

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

N.Y.C.R.R. § 701.8(b). If, after reviewing the grievance of the superintendent finds it not to be facially meritorious, the matter reverts back to the inmate grievance resolution committee ("IGRC") for review. 7 N.Y.C.R.R. § 701.8(c). If, on the other hand, the superintendent believes that an investigation is warranted, he or she may initiate an in-house investigation, or instead, request investigation by the inspector general's office. 7 N.Y.C.R.R. § 701.8(d). Once the grievance is determined, a matter which must occur within twenty-five business days of filing, see 7 N.Y.C.R.R. § 701.8(f), the inmate may appeal to the CORC, a step which is required in order to satisfy the exhaustion requirement. See Singh v. Goord, 520 F.Supp.2d 487, 495 (S.D.N.Y.2007) (indicating that appeal to the CORC is required to exhaust a prisoner's administrative remedies in New York State); Sulton v. Greiner, No. 00 Civ. 0727, 2000 WL 1809284, at *4 (S.D.N.Y. Dec.11, 2000) (granting summary judgment for failure to exhaust administrative remedies where prisoner neglected to appeal to the CORC).

> FN17. Before utilizing this procedure, an inmate generally should first report any incident to an employee's supervisor. 7 N.Y.C.R.R. § 701.8(a).

> FN18. The regulations pertaining to the grievance process describe harassment as any allegation involving "[e]mployee misconduct met to annoy, intimidate, or harm an inmate ..." 7 N.Y.C.R.R. § 701.2(e); see also DOCS Directive No. 4040.

In this instance the record discloses that plaintiff did not follow either of these procedures with regard to his claims of retaliation, instead by-passing the grievance process altogether by allegedly writing letters to the facility superintendent. It is well-established that such communications, however, are insufficient to satisfy the PLRA's exhaustion requirement. See, e.g., Houze v. Segarra, 217 F.Supp.2d 394, 397 (S.D.N.Y.2002).

Despite an inmate's entitlement under most circumstances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. See Hemphill, 380

F.3d at 687-88. Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, ... or where defendants' behavior prevents plaintiff from seeking administrative remedies." Hargrove, 2007 WL 389003, at *8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." Id. at 688 (internal quotations and citations omitted); see Hargrove, 2007 WL 389003, at *8.

*11 From a review of the record before the court it appears that the claims now being raised by the plaintiff constitute grievable controversies as defined under the IGP. Plaintiff has asserted no basis to conclude that he misunderstood the grievance process or that through their actions the defendants improperly deterred his filing of a grievance, and the record discloses no basis for such a finding.[FN19] Accordingly, I conclude that there was an administrative remedy available to the plaintiff in this case at the times relative to his claims.

> FN19. The court is somewhat hampered in its ability to determine whether a basis exists to excuse the requirement of exhaustion in this case, in light of plaintiff's failure to respond to defendants' motion. The record is lacking, however, in any evidence suggesting that the defendants or other prison officials prevented Applegate from pursuing available administrative remedies. Brown Aff. (Dkt. No. 52-4) Exh. A at 43-44; see also Defendants' Local Rule 7.1(a)(3) Statement ¶ 83.

### 2. Presentation of Defense/Estoppel

The second prong of the Hemphill analysis focuses upon "whether the defendants may have forfeited the

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted).

In their answer, defendants have asserted failure to exhaust as an affirmative defense. *See* Answer (Dkt. No. 41) ¶ 14. Since the record does not disclose any circumstances which would warrant a finding that defendants have relinquished the affirmative defense of non-exhaustion, I find no basis to conclude that the defendants have forfeited their right to assert an exhaustion defense.

3. *Special Circumstances*

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676-77 (2d Cir.2004); *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ). In this instance plaintiff does not allege, nor does the record disclose, any special circumstances which would justify excusing the plaintiff from the PLRA exhaustion requirement.

In sum, the record supports a finding, as defendants now assert, that with the exception of his court access claims, plaintiff has forfeited his right to pursue the remaining cause of action in his complaint by failing to satisfy the exhaustion requirement before filing this action. I therefore recommend that the portion of defendants' motion seeking dismissal of plaintiff's claims, with the exception of the court access claim, be granted on this procedural basis.

D. *Sufficiency Of Plaintiff's Excessive Force Claim*

*12 The centerpiece of plaintiff's complaint in this action is his claim against defendant Carlson, alleging that during the course of conducting a security pat-frisk he exerted excessive force toward him, thus violating his rights under the Eighth Amendment. In their motion, defendants contend that even if this claim were not subject to dismissal for failure to exhaust, they would nonetheless be entitled to summary judgment dismissing the claim as a matter of law because no reasonable factfinder could conclude that the incident arose to a level of constitutional significance.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)).

Eighth Amendment analysis requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91. The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive, as the defendants seemingly suggest. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe' ", a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

**\*13** In his complaint plaintiff alleges that he was "grabbed ... by the back of his shirt" by Carlson, who "attempted to slam his face into the wall." Complaint (Dkt. No. 1) ¶ 37. Plaintiff also alleges that defendant Carlson continued "to attempt to smash [his] face into the wall[.]" [FN20] *Id.* ¶ 38. Plaintiff does not allege, however, that he was required to seek medical treatment, or for that matter that he suffered any significant injury as a result of defendant Carlson's actions, and in fact acknowledged during his deposition that he was not injured as a result of the incident. Brown Aff. (Dkt. No. 52-4) Exh. A at 55.

> FN20. During his deposition, plaintiff recounted a slightly different version of the incident, noting that Officer Carslon "slammed [him] in the back and tried to ... slam [his] face against the wall...." Brown Aff. (Dkt. No. 52-4) Exh. A at 49.

In his affidavit Officer Carlson notes that the incident occurred during a routine pat-frisk of all inmates, accomplished for security reasons. Carlson Decl. (Dkt. No. 52-13) ¶¶ 4-13. Officer Carlson also asserts that the use of force was necessitated by plaintiff's removal of his hand from the walls during the pat-frisk despite instructions that he keep his hands "high and flat on the wall" ... and not "take them down until [he was] told to do so ." *Id.* ¶ 14. Defendant denies attempting to push the plaintiff's face into the wall and any intent to cause bodily harm, instead stating that he simply took measures calculated to respond to what he believed was a threat of resistence by the inmate. *Id.* ¶¶ 22-23. Under these circumstances, from an objective point of view, I am unable to find that plaintiff's excessive force claim arises to a level of constitutional significance. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (the fact that the plaintiff, who claims he was "bumped, grabbed,

elbowed, and pushed" by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at \*5 (S.D.N.Y. Nov. 22, 2002). Accordingly I recommend a finding that objectively, plaintiff's excessive force claim is legally insufficient.

Turning to the subjective element, as defendants argue, to prevail plaintiff must establish that defendant acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d at 1033). When considering the subjective element of the governing Eighth Amendment test, a court must consider that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

**\*14** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) ( McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

mankind." [FN21] *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

> FN21. It should be noted, however, that in practice a truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action"); *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

Analyzing the subjective element, utilizing this test as a backdrop, I conclude that the record does not support a finding of requisite subjective intent. Accordingly, having found that when presented with the evidence now before the court no reasonable factfinder could conclude that plaintiff has met either the objective or the subject component of the controlling test, I recommend the entry of summary judgment dismissing his excessive force claim in its entirety.

E. *Sufficiency Of Plaintiff's Retaliation Claim*

Another primary focus of plaintiff's complaint in this action is his retaliation claim. Plaintiff contends that in retaliation for his having brought and prosecuted the claims raised in *Applegate I,* prison officials at Greenhaven engaged in retaliatory conduct against him. Plaintiff also alleges that after writing to Greenhaven Superintendent C. Artuz regarding harassment on February 21, 1999, he was the subject of further pat-frisks and the use of excessive force by Corrections Officer Carlson on March 4, 1999. Defendants also seek dismissal of this cause of action, asserting that it is stated in purely conclusory terms and that the record is lacking in evidence to establish the requisite connection between the various actions taken against plaintiff and the events which allegedly precipitated them.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) he or she engaged in protected activity; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002). If the plaintiff succeeds in meeting this burden, then the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct" in order to avoid liability, *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Put another way, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*15** The theory articulated by the plaintiff in support of his retaliation claim is that defendant Annucci, a Deputy Commissioner and the General Counsel for the DOCS, directed that DOCS employees at Greenhaven retaliate against him in light of having filed suit in *Applegate I.* [FN22] In support of their motion defendants have submitted an affirmation from Deputy Commissioner Annucci in which he points out that in his capacity as General Counsel he has overarching responsibility for the provision of legal services necessary to operate the DOCS, with its 31,600 employees and 63,800 inmates. Annucci Aff. (Dkt. No. 52-12) ¶ 2. Defendant Annucci further notes that his involvement in inmate litigation, which is typically defended by the office of the New York State Attorney General, is extremely limited and ordinarily would only involve class actions or issues implicating overall departmental policies. *Id.* ¶¶ 4-7. Defendant Annucci also notes that at any given time there are thousands of lawsuits pending against the DOCS or its employees. *Id.* ¶ 7. Defendant Annucci states that to his recollection he had no contact with the attorneys representing the defendants in *Applegate I,* and denies having ordered anyone to retaliate against the plaintiff, including to initiate a weapons possession charge at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

Elmira. *Id.* ¶¶ 10, 16-17.

> FN22. Plaintiff also seemingly alleges that a Tier II misbehavior report, received shortly following the 1999 incident, was issued in retaliation for his having "immediately" written to the DOCS Inspector General's Office on that same date complaining of the matter. Complaint (Dkt. No. 1) ¶¶ 39-40. There is no evidence in the record, however, to link the two, or to indicate defendant Carlson's awareness of the writing of that letter, or to otherwise suggest that the misbehavior report was issued solely in retaliation for that letter.

Now that the matter has progressed to the summary judgment stage, it is no longer sufficient for the plaintiff to engage in mere conjecture; instead, in response to the defendants' motion it was incumbent upon Applegate to come forward with evidence from which a reasonable factfinder could find the requisite nexus between his pursuit of claims in *Applegate I*-unquestionably activity which is constitutionally protected-and the adverse actions taken against him. *See Mount Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. It should be noted that none of the defendants in this action were defendants in *Applegate I*, and that matter appears to have implicated actions taken by DOCS employees at prisons other than those involved in this case, including the Shawangunk Correctional Facility, the Woodburn Correctional Facility, the Downstate Correctional Facility, the Southport Correctional Facility, and the Clinton Correctional Facility. Simply stated, the record discloses no basis to conclude that the defendants in this action had knowledge of the *Applegate I* suit, nor any basis upon which a factfinder could conclude that the pursuit of plaintiff's claim in *Applegate I* led to retaliatory animus on the part of the defendants named in this action.

As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around the engaging in protected conduct, and require establishment of a nexus between that conduct and the adverse action ultimately taken. Because plaintiff's retaliation claims have been alleged in only conclusory form, and are not supported by evidence now in the record establishing a nexus between any protected activity and the adverse actions complained of, I recommend that defendants' motion for summary judgment dismissing plaintiff's retaliation claims be granted. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983).

F. *Sufficiency of Plaintiff's Court Access Claim*[FN23]

> FN23. In the court's prior orders, all of plaintiff's court access claim, with the exception of the portion related to the challenge of his state court conviction, was dismissed based upon lack of prejudice. *See* Report and Recommendation, dated 9/21/05 (Dkt. No. 38) at pp. 21-24; Decision and Order, dated 2/2/06 (Dkt. No. 40).

**\*16** The portion of plaintiff's court access claim which remains intact, following the earlier decision regarding defendants' dismissal motion, concerns his alleged inability to conduct proper research in order to pursue a request for leave to appeal from an apparent denial of a N.Y. Criminal Procedure Law § 440.10 motion collaterally challenging his underlying murder conviction. Complaint (Dkt. No. 1) ¶¶ 57-68. Defendants assert that this claim, though properly exhausted, is legally deficient because plaintiff cannot establish a right of court access protected by the Constitution.

Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established. *Bounds v. Smith*, 430 U.S. 817, 823, 97 S.Ct. 1491, 1495 (1977) (citations and internal quotation marks omitted). Although in *Bounds* the Supreme Court held that this right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law[,]" *id.* at 828, 97 S.Ct. at 1498, the Court later clarified that

> prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

assistance program is subpar in some theoretical sense.

*Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 2180 (1996) (internal quotations and citations omitted). Instead, to prevail on such a claim an inmate "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* In other words, to establish a violation of the right of access to the courts, a plaintiff must demonstrate that defendants' interference caused him or her actual injury-that is, that a "nonfrivolous legal claim had been frustrated or was being impeded" as a result of defendants' conduct. *Id.* at 353, 116 S.Ct. at 2181.

Plaintiff's court access claims surround the alleged inadequacy of law library facilities at Upstate. *See* Complaint (Dkt. No. 1) ¶¶ 58-60; *see also* Brown Aff. (Dkt. No. 52-4) Exh. A at 21-23. Plaintiff asserts that because it was a new facility at the time of his transfer there, Upstate did not then contain a fully stocked law library.[FN24] *Id.* Accordingly, while acknowledging that he had adequate opportunity to perform legal research at Greenhaven in connection with his initial motion under N .Y. Criminal Procedure Law § 440.10, *see* Brown Aff. (Dkt. No. 52-4) Exh. A at 28, plaintiff apparently contends that he was deprived of sufficient materials to support his request for leave to appeal from the unfavorable determination of that application.

> FN24. According to the plaintiff, beginning in or about October of 1999 a CD ROM computer system was installed at Upstate for the purpose of permitting inmates to perform legal research. Brown Aff. (Dkt. No. 52-4) Exh. A at 32. That was followed by the acquisition of books and legal manuals, beginning the following month. *Id.* at 32-33. Plaintiff's challenge to the inadequacy of the legal facilities at Upstate in this action is apparently limited to during the first four months that the prison was open. *Id.* at 33.

*17 There are two fatal deficiencies in plaintiff's library access claim. First, neither plaintiff's complaint nor his deposition reveal the existence of any injury suffered as a result of the alleged library shortcomings. After the

failure of his section 440.10 motion, which he was fully able to research and file, plaintiff was apparently able to file a request for leave to appeal, having been provided with the requisite paper and writing instruments to do so. Plaintiff apparently surmises that had he been able to conduct proper research, his request for permission to appeal might have been granted; such rank speculation, without more, is insufficient to establish the specific prejudice necessary to support a constitutional claim. *See, e.g., Konigsberg v. LeFevre,* 267 F.Supp.2d 255, 261-62 (N.D.N.Y.2003) (Munson, S.J.) (rejecting plaintiff's access to the courts claim where he asserts in purely speculative and conclusory terms that his inability to access certain legal files "perhaps" may have caused him to lose his subsequent new trial).

There is another, equally compelling reason for dismissing plaintiff's court access claims. Aside from Corrections Officer Gardner, who was never served and who plaintiff agrees was a mere "pawn" and could not have changed the system at Upstate, there is no one among the named defendants in this case who, plaintiff has demonstrated, had personal involvement in the failure to provide law library facilities. Since personal involvement in a constitutional deprivation is a prerequisite to finding liability, *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)), plaintiff's failure to name any defendant personally involved in that deprivation warrants dismissal of the court access claim.

G. *Personal Involvement Of Superintendent Bennett*

Among the defendants named in plaintiff's complaint is F.G. Bennett, the Superintendent at Elmira during the relevant period. Plaintiff's claims stemming from events at Elmira relate to the loss of property, a claim which was previously dismissed, as well as the alleged planting of a weapon in his cell. Defendants assert that this is an insufficient basis to hold defendant F.G. Bennett personally accountable for the constitutional claims set forth in plaintiff's complaint.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

damages under section 1983. *Wright,* 21 F.3d at 501 (citing *Moffitt,* 950 F.2d at 885 (2d Cir.1991) and *McKinnon,* 568 F.2d at 934 (2d Cir.1977)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*18** A supervisor like Superintendent Bennett cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

The record discloses no basis to find personal involvement, or indeed any awareness, on the part of defendant Bennett in connection with plaintiff's weapons planting allegation. While plaintiff does allege that defendant Bennett was aware of the stolen properly claim by virtue of his letter to the superintendent complaining of that incident, the mere writing of the letter to a superintendent, without response, is an insufficient basis to find personal involvement on the part of the Superintendent.[FN25] *Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing, *inter alia, Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent

of prison where only allegation was that he ignored inmate's request for an investigation)).

> FN25. In any event, plaintiff's lost property claim has already been dismissed by the court.

In sum, based upon the lack of any showing of personal involvement on the part of defendant Bennett in the constitutional violations alleged, I recommend his dismissal from the action on this independent basis.

IV. *SUMMARY AND RECOMMENDATION*

Because plaintiff failed to file and pursue to completion a grievance regarding any of the claims asserted in his complaint, with the exception of the court access claim, the pursuit of those claims in this action is procedurally barred as a result of Applegate's failure to satisfy the PLRA's exhaustion requirement before filing suit. Turning to the merits of the claims advanced by the plaintiff, who has chosen not to file any response to defendants' summary judgment motion, I find that the record lacks any evidence from which a reasonable factfinder could conclude that excessive force was used by defendant Carlson against him during the course of a security-related pat-frisk, or that any of the defendants retaliated against him based upon, *inter alia,* his commencement of and pursuit of claims in *Applegate I.* Plaintiff's complaint is also deficient insofar as it alleges the denial of court access, based both upon the lack of any showing of involvement on the part of the defendants in the failure to provide adequate library facilities at Upstate over a brief period of time following its opening, and further based upon the fact that plaintiff has not established the existence of any injury or prejudice resulting from that alleged failure. Finally, I find that by virtue of plaintiff's failure to serve him, defendant Gardner is entitled to dismissal of plaintiff's claims against him, without prejudice, and further find that defendant Bennett is entitled to dismissal of all claims against him based upon the lack of any showing of personal involvement in the constitutional deprivations alleged.[FN26]

> FN26. In light of my findings with respect to merits of plaintiff's claims I find it unnecessary to address plaintiff's additional argument of entitled to qualified immunity. *See Saucier v. Katz,* 533

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))


U.S. 194, 121 S.Ct. 2151 (2001).

**\*19** Based upon the foregoing, it is hereby

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 52) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety, without prejudice against defendant C.O. Gardner, but otherwise with prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.

Applegate v. Annucci
Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.